IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          *

          vs.                     *    CRIMINAL NO. MJG-11-0657
                                       (CIVIL No. MJG-15-1940)
FRANK MARFO                       *

*       *       *       *       *       *       *       *       *

<u>MEMORANDUM AND ORDER</u>

The Court has before it Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF No. 211], Petitioner's Amended Motion and Memorandum to Vacate, Set Aside, or Correct Judgments [ECF No. 277], Petitioner's Motion for Leave to Conduct Discovery [ECF No. 278], and the materials submitted relating thereto.  The Court finds that a hearing is not necessary.


I.   <u>BACKGROUND</u>

Petitioner Frank Marfo ("Marfo" or "Petitioner") brings a 28 U.S.C. § 2255 motion challenging his federal life sentence for his convictions of murder for hire, conspiracy to murder a witness, bank fraud, conspiracy, and other offenses.  In addition to the grounds stated in the original § 2255 motion [ECF No. 211], Marfo presented in his Amended Memorandum of Law [ECF No. 277] a ground regarding a time zone disparity in the

cell-tower evidence used during his trial.  The Court will evaluate all asserted grounds herein.

Marfo participated in "a scheme to steal money orders and checks and to defraud banks in Maryland and elsewhere" from May 2009 to November 2011.  United States v. Marfo, 572 F. App'x 215, 218 (4th Cir. 2014).  This scheme involved a theft of money orders and checks from rent deposit boxes located in Maryland, Virginia, and Delaware.  Id.  Tavon Davis ("Davis") and Marfo recruited persons to open fraudulent accounts at banks in Maryland and New Jersey.  Id.  These accounts were used in the scheme for depositing "between $1 million and $1.5 million worth of stolen money orders."  Id.

In May 2009, Davis recruited a young man, Isaiah Callaway ("Callaway"), to participate in the scheme.  Id.  Callaway was arrested by Baltimore County police on December 29, 2010 while participating in the scheme and was charged with possession of counterfeit documents and theft.  Id. at 218-19.  After arrest, Callaway was interviewed by detectives, admitted his participation in the bank fraud scheme, and was placed on pretrial release.  Id. at 219.

Following Callaway's release, Davis contacted him and referred him to Attorney Larry Feldman ("Feldman"), who became his attorney.  Id.  Thereafter, federal law enforcement officials became interested in interviewing Callaway about the

bank fraud scheme and contacted Feldman to request interviews from Callaway. Id. Feldman, although counsel for Callaway, informed Davis about the federal officials' intention to interview Callaway in an investigation that could lead the federal investigators to Davis and Marfo. Id.

Between April 5, 2011 and April 11, 2011, Davis and Marfo communicated and met several times with Bruce Eric Byrd ("Byrd") to discuss the threat to the fraud scheme posed by the arrest and possible cooperation of Callaway. Id. This included discussions about having Byrd murder Callaway to prevent him from providing the investigators with information about the bank fraud scheme. Id. On April 11, 2011, Callaway was found shot dead in a car in Baltimore. Id.

In May 2011, Michael Copeland ("Copeland"), another participant in the scheme, told the police that Callaway was murdered by a triggerman (later determined to be Byrd), who had been hired by Davis and Marfo. Id. Copeland agreed to record his future meetings with Davis. Id. In those recordings, Davis incriminated himself and stated that Byrd and Marfo were "just as involved as he was." Id. Davis was subsequently arrested in November 2011 and agreed to cooperate against Marfo and Byrd, including confirming that Marfo contributed the money given to Byrd for killing Callaway. Id. With Davis's cooperation, Byrd and Marfo were arrested. Id. at 219-20. Davis and Byrd both

entered into plea agreements including benefits for cooperating against Marfo.  Id. at 220.  Davis testified at Marfo's trial, but Byrd did not.

Following his conviction on all counts, Marfo was sentenced to concurrent sentences of life imprisonment on four counts, a consecutive sentence of 120 months on another count, and concurrent sentences of 57 months on two counts.  Id.  The Fourth Circuit affirmed his conviction and sentence on May 23, 2014.  Id.  The Supreme Court denied certiorari on November 3, 2014.  Marfo v. U.S, 135 S. Ct. 468 (2014).


II.  MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENTS

A. Legal Standard

To prevail on a 28 U.S.C. § 2255 claim, the petitioner bears the burden of proof to show, by a preponderance of the evidence, that his sentence is unlawful on one of several specified grounds.  Berry v. United States, 884 F. Supp. 2d 453, 457 (E.D. Va. 2012).

A district court must resolve a Section 2255 petition in two steps.  United States v. Pettiford, 612 F.3d 270, 277 (4th Cir. 2010).  First, the district court "must determine whether the prisoner has met his burden of showing that his sentence is unlawful."  Id.  Second, "if the prisoner's sentence is found

4

unlawful on one of [the specified] grounds, the district court should grant the prisoner an 'appropriate' remedy." Id.

One of the specified grounds is the denial of a Sixth Amendment right to reasonably effective assistance of counsel. To prevail, the petitioner must satisfy the Strickland standard of showing that counsel's performance was deficient, and that the deficient performance prejudiced the petitioner's defense. See Rodriguez v. Bush, 842 F.3d 343, 346 (4th Cir. 2016) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

To establish "deficient performance," the petitioner must show that the counsel's representation "'fell below an objective standard of reasonableness,' as measured by 'prevailing professional norms.'" United States v. Powell, 850 F.3d 145, 149 (4th Cir. 2017) (internal citations omitted). This is a high bar and requires "'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Id. The court must avoid viewing counsel's performance through the distorting effects of hindsight, and must be satisfied that the petitioner has overcome "'a strong presumption' that [his] counsel's conduct [fell] within the wide range of reasonable professional assistance." Id.

To establish prejudice, "'[t]he defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.'" Rodriguez v. Bush, 842 F.3d 343, 346 (4th Cir. 2016) (internal citations omitted). A reasonable probability is a "'probability sufficient to undermine confidence in the outcome.'" Id.

B. Discussion

Most of Marfo's asserted claims allege ineffective assistance of counsel, and one claim (Claim 4)[1] alleges a violation of his due process rights under Brady v. Maryland, 373 U.S. 83 (1963).

i. Claim 1: Defendant's Appearance in Jail Clothing

Petitioner argues that counsel provided ineffective assistance by allowing the jury to see him in jail clothes during voir dire and opening statements and for not raising the issue on direct appeal. Am. Mot. at 23, ECF No. 277. Petitioner alleges that wearing prison clothing undermined his right to a fair trial, was not based upon any sound trial strategy, and prejudiced him by communicating to the jury that he was too dangerous to be released before trial. Id. at 25.

_____

[1] The Claim numbers refer to the numbers used by the Petitioner and the Government in their briefing to this Court [ECF Nos. 231 and 277].

The Court finds, however, that Marfo made a strategic decision to wear the jail clothing consistent with a trial strategy.  He discussed with his counsel before the decision, and wore the clothing to paint himself as a victim of co-defendant Davis, to show that he has conceded the fraud and is already being punished for it (so as to maintain his credibility when he contests his murder charge), and to show that he is poor.  Gov.'s Resp. at 58, ECF No. 231.  Defense counsel made references to the Petitioner's jail clothes in the opening statement and confirmed to the Court that this was Petitioner's intention at the time.  Id. at 60-63.

On the first day of trial, Attorney Purpura brought the jail clothing issue to the Court's attention and explained that, as part of the opening, the defense would draw attention to the fact that Marfo has been detained:

> THE COURT: You say he's going to be wearing this during the trial?
>
> MR. PURPURA: Yes. In the opening I think Mr. Bussard is going to make it clear that he is detained, and has been detained since the day he was arrested. That's it. We can take care of it.
>
> THE COURT: Okay. I mean if that's what you want, that's okay.

Trial Day 1 Tr. at 2:13-20 (ECF No. 147).

On a Section 2255 motion, the Court must afford a high degree of deference to counsel's trial strategy.  Powell, 850 F.3d at 149 ("'[j]udicial scrutiny of counsel's performance must be highly deferential.'") (internal citations omitted).  The Court finds that Attorney Purpura's trial strategy was reasonable under the circumstances and does not establish deficient performance.

Attorney Purpura submitted an affidavit explaining that it was "part of our trial strategy to concede the fraud conviction and contest the murder . . . [b]y admitting the fraud, we had hoped that Marfo's claim of innocence for the murder would be more credible."  Purpura Aff. at 1-2, ECF No. 231-3.

The Court finds no basis to hold that counsel's trial strategy "'fell below an objective standard of reasonableness.'" Powell, 850 F.3d at 149.  The risk that the strategy itself may have been ineffective is a risk that all litigants must face at trial.

Furthermore, Petitioner did not raise this issue on direct appeal and may not raise it now.  United States v. Landrum, 93 F.3d 122, 124 (4th Cir. 1996) ("A claim raised for the first time in a § 2255 motion generally is not cognizable in federal court unless the petitioner demonstrates 'both (1) 'cause' excusing his . . . procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains.'")

(internal citations omitted).  The Court does not find any excusable cause for failing to raise this issue on direct appeal.

Accordingly, the Court finds that Marfo is not entitled to Section 2255 relief on the basis that trial counsel made the strategic decision to have him dress in jail clothing.

### ii. Claim 2: Attorney Catherine Flynn

Petitioner argues that his trial counsel provided ineffective assistance by failing to investigate and call Attorney Catherine Flynn, one of Davis's former defense attorneys.  Am. Mot. at 26-27, ECF No. 277.  He alleges that Ms. Flynn would have testified that she believed that co-Defendant Davis was trying to "set up" Marfo, in order to protect himself from murder charges.  Id. at 28.  This testimony, Petitioner claims, would have neutralized the damaging testimony from Attorney Murphy, who testified to what Davis told him about the murder conspiracy involving Marfo.  Id. at 30.

The Government states that counsel's decision to not investigate and call Attorney Flynn is a tactical decision that cannot be subject to challenge.  Gov.'s Resp. at 72, ECF No. 231.  Moreover, the Government argues that Attorney Flynn could not have impeached Attorney Murphy because Davis never incriminated himself to Attorney Flynn, and the defense

attorneys for Marfo were aware of that fact.  Id. at 73-74.
Finally, the Government argues that Petitioner's claim is based
on the inadmissible testimony of an "intern" working for Marfo's
defense counsel stating what Attorney Flynn allegedly said to
the intern out of court.  Id. at 76.

Attorney Flynn has submitted an affidavit that describes
the conversation she had with Miranda Dore, the "intern" who
worked in the office of Petitioner's defense attorney.  Flynn
Aff., ECF No. 231-2.  Ms. Dore had previously submitted an
affidavit to Petitioner's original Motion to Vacate, attributing
certain statements to Attorney Flynn,[2] who did not have an
opportunity to confirm the accuracy of those statements.
Compare Dore Aff., ECF No. 214-1, with Flynn Aff. ¶¶ 11-17, ECF
No. 231-2.  Attorney Flynn states in her affidavit that she
"never stated that [she] suspected that Mr. Davis was planning
or intended to 'set someone up' or to do anything in that vein,"
"never suspected that Mr. Davis was seeking my advice in order
to 'set someone up,'" and "never heard any recordings of Davis."
Flynn Aff. ¶¶ 18-20, ECF No. 231-2.  She states that she did not

---

[2] Ms. Dore's affidavit states that she was interning for
Petitioner's counsel and that Attorney Flynn "said that she
suspected that Mr. Davis was seeking information from her to set
someone up and that she was not surprised to learn about the
body-wiretaps in which Mr. Davis attempted to implicate Mr.
Marfo."  Dore Aff. ¶ 6, ECF No. 214-1 at 50.

hold the opinion, belief, or knowledge that Davis intended to "set anyone up." Id. ¶ 24.

The intern testimony, if offered to prove what Attorney Flynn said about her feelings regarding Davis's motives, would be inadmissible hearsay. Even if Attorney Flynn were to testify that she had feelings and suspicions that Davis made false statements to Attorney Murphy to set up Marfo, those feelings would not constitute proof of the truth or falsity of what Davis said. Moreover, the statements in the intern's affidavit regarding what Attorney Flynn said are largely refuted by the affidavit of Attorney Flynn herself.

The Court does not find that Petitioner has carried his burden of establishing entitlement to relief on the basis of Dore's affidavit, and declines to provide a remedy on the basis of her statement about what Attorney Flynn allegedly said she had believed at the pertinent time.

The Court must give a high degree of deference to defense counsel's decision on which witnesses to present to the jury. United States v. Dyess, 730 F.3d 354, 364 (4th Cir. 2013) ("we give counsel wide latitude in determining which witnesses to call as part of their trial strategy"); Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) ("[d]ecisions about what types of evidence to introduce 'are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention

and what sort of mitigating evidence they can choose not to introduce'"). Although it is true that courts have held counsel's representation to be deficient if counsel fails to investigate and interview critical prospective witnesses, Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998) (citing cases), Attorney Flynn's proposed testimony about her suspicions did not put her into this category.

The Court finds that the Petitioner has not carried his burden of showing, by a preponderance of the evidence, that he is entitled to relief from his sentence because of his attorney's decision not to call Attorney Flynn as a witness.


### iii. Claim 3: Byrd's Refusal to Testify at Trial

Petitioner contends that his counsel operated under a conflict of interest by advising Byrd that if Byrd testified in favor of Marfo at Marfo's trial, the Government would give Byrd a life sentence. Am. Mot. at 31-32, ECF No. 277. This advice allegedly caused Byrd to plead the Fifth Amendment and refuse to testify. Id. at 32. Hence, Petitioner argues, he was prevented from eliciting testimony from Byrd that would have destroyed Davis's credibility and refuted his testimony. Id. at 33.

The Government disputes the factual basis for the claim and asserts that the evidence presented by Marfo to support this claim (i.e., Marfo's own testimony of an out of court statement

allegedly made by Byrd) is hearsay and inadmissible to prove the truth of Byrd's alleged out of court statement. Gov.'s Resp. at 83-84, ECF No. 231.

A petitioner who claims ineffective assistance of counsel based on a conflict of interest must show that his or her attorney labored under an "'actual conflict of interest'" which "adversely affected his lawyer's performance.'" Stephens v. Branker, 570 F.3d 198, 209 (4th Cir. 2009) (internal citations omitted). An actual conflict of interest exists when the petitioner's interests diverged from his attorney's with respect to a "material factual or legal issue or to a course of action." Id. The adverse element requires a showing that the counsel took action for one client (or himself) that is "necessarily adverse" to another client, or that the counsel failed to take action for one client (or himself) for fear of injuring another client. Id. Moreover, the counsel's action must have been causally related to the actual conflict. Id.

Proof of any incorrect "advice" that Petitioner's counsel gave Byrd (who was not his client) would not establish that "petitioner's interests diverged from his attorney's." Stephens, 570 F.3d at 209. Petitioner had his own counsel (Attorney Purpura and Attorney Bussard), and Byrd also had his own counsel (Attorney Curlett). Purpura Aff. at 3, ECF No. 231-3. On the day in question, Purpura wished to interview Byrd to

see if Byrd's testimony would corroborate Marfo's story and determine whether Byrd would testify for Marfo.  Id.  The record shows that Byrd's decision to not testify was made after he had the opportunity to speak to his own counsel.  As Mr. Purpura states in his affidavit:

> With the arrival of his attorney, Mr. Byrd
> directed a question that appeared to be to
> me, concerning that if he testified would
> that effect [sic] his plea. I said that is
> an issue you should discuss with your
> attorney and Mr. Bussard and I then waited
> outside the interview booth. Approximately
> five to ten minutes later, Mr. Curlett
> confirmed that Mr. Byrd if called by defense
> would invoke his Fifth Amendment right
> against self-incrimination. I wanted Marfo
> to hear Mr. Byrd invoke his Fifth Amendment
> Right and requested that this take place in
> open court with Marfo present. After a
> lengthy colloquy which is now part of this
> record between Mr. Byrd, Judge Garbis and
> Mr. Curlett, Mr. Byrd elected not to
> testify.

Id.  Purpura states his understanding that Byrd chose not to testify for Marfo in part because Byrd had already stipulated to contrary facts in his plea agreement and doing so would have consequences for his sentencing.  Id. at 4.

The record also shows that Byrd made that decision after speaking with his attorney:

> MR. CURLETT: Are you in fact invoking your
> Fifth Amendment right not to testify in
> today's proceedings?
> THE WITNESS: Yes.
> MR. CURLETT: Thank you.

THE COURT: All right. Anybody else have any
               questions about what was just said?
               MR. PURCELL: No, Your Honor.
               MR. PURPURA: Has anyone forced you or
               threatened you or coerced you in any manner
               to take this position today?
               THE WITNESS: No.
               MR. PURPURA: You decided this after speaking
               with your attorney; is that correct?
               THE WITNESS: Yes.

Trial Day 5 Tr. at 6:12-7:1, ECF No. 146.

     The record does not by any means establish that Attorney

Purpura acted vis-à-vis Byrd under a conflict of interest.  In

fact, Purpura interviewed Byrd with the purpose of seeing if

Byrd would provide testimony helpful to Marfo.  Purpura could

not force Byrd to testify and had no alleged motive to block any

testimony from Byrd.  Petitioner may not prevail on a conflict

of interest claim regarding ineffective assistance of counsel

when there was no actual conflict of interest.

     Moreover, Marfo has not provided admissible evidence that

Attorney Purpura advised Byrd to plead the Fifth.  This claim

appears to be based on Marfo's affidavit, which states:

               14. Later, Byrd reached a plea agreement,
               and he too confirmed that he did not know me
               before we met in pretrial detention. I then
               encouraged my attorney to subpoena Byrd at
               my trial to testify that he did not know me.
               15. After trial, Mr. Byrd told me what
               happened between him and Mr. Purpura in the
               holding cell before Mr. Byrd testified.
               16. Before Byrd testified, my attorney
               visited him in the holding area. During that
               meeting, Mr. Purpura told Mr. Byrd that the
               government would revoke his plea agreement

                                   15

and seek a life sentence. Mr. Byrd refused
to testify at my trial because of this
advice.

Marfo Aff. ¶¶ 14-16, ECF No. 215.

In other words, Petitioner bases his Section 2255 claim on
his statement of what Byrd allegedly told him out of court after
the trial about what Purpura allegedly told Byrd.  This is
hearsay and inadmissible to establish the truth of the alleged
out of court statement by Byrd.  Moreover, it is not at all
clear that any of Byrd's proposed testimony would have
materially supported Petitioner's defense.

For the foregoing reasons, Section 2255 relief may not be
granted to Petitioner on the basis that his counsel acted under
an alleged conflict of interest and blocked testimony from Byrd.

### iv. Claim 4: Government's Alleged Failure to Disclose an Exculpatory Statement by Byrd

Petitioner argues that the Government failed to inform him
that Byrd had refused a Government offer for leniency in
exchange for testifying against Marfo.  Am. Mot. at 34, ECF No.
277.  According to Petitioner, this shows that "Byrd
communicated that Marfo was not part of the meetings that were
the center of the government's theory" and "shows that Marfo and
Byrd never met to form a conspiracy."  Id. at 34, 35.  This

denial of a government offer could have been used to "show that Davis was lying." Id.

This Section 2255 claim is based on Marfo's affidavit, which states: "17. Byrd also told me that Mr. Purcell offered him a reduced sentence if he would testify against me. Byrd said that he told his attorney to tell Mr. Purcell that he could not do that because I was not involved." Marfo Aff. ¶ 17, ECF No. 214-1. The contention is factually based upon inadmissible hearsay, i.e., the alleged truth of the content of an out of court statement by Byrd. As stated by the Court in a letter to parties on September 23, 2015:

> Presumably, Defendant Marfo is contending that Defendant Byrd told his attorney (without specification as to which attorney) to tell Mr. Purcell that Defendant Byrd said that Defendant Marfo was not involved in the murder at issue. The statement of Defendant Marfo is inadmissible hearsay inadequate to establish anything more than that Defendant Byrd made the alleged statement to Defendant Marfo. The fact – if it is a fact – that Byrd made the statement to Defendant Marfo would not establish that Defendant Byrd actually made the alleged statement to his attorney(s) nor, of course, that the attorneys made any statement to the prosecutor.

Letter to All Counsel of Record at 1-2, ECF No. 226. There is no evidence in the record that would establish that Byrd made the alleged statement or that Byrd's attorney(s) made any such statement to the prosecutor in the case.

Moreover, Petitioner did not raise this issue on direct appeal and may not raise it now.  <u>Landrum</u>, 93 F.3d at 124 ("A claim raised for the first time in a § 2255 motion generally is not cognizable in federal court unless the petitioner demonstrates 'both (1) 'cause' excusing his ... procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains.'").  The Court does not find any excusable cause or actual prejudice for failing to raise this issue on direct appeal.

Finally, to prevail on a <u>Brady</u> claim, the petitioner must demonstrate "(1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense."  <u>United States v. Higgs</u>, 663 F.3d 726, 734–35 (4th Cir. 2011).  The prosecutor's duty in this regard is not unlimited.  There is no <u>Brady</u> violation unless "'unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'"  <u>Id.</u> at 735 (internal citations omitted).  A "'reasonable probability'" exists "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  <u>Id.</u>

Even if the evidence at issue (<u>i.e.</u>, that Byrd refused an offer of leniency) would have been "favorable" to Marfo, it is

18

by no means clear that the evidence would have been "material" to the defense.  The jury would have to draw the specific conclusion that Byrd refused the offer to testify because Byrd knew that Marfo did not actually commit the alleged acts, and not that Byrd refused to testify for some different reason. Petitioner's speculation about how this potential testimony would have been considered by the jury does not rise to the level of showing a "'reasonable probability that the suppressed evidence would have produced a different verdict.'"  <u>Higgs</u>, 663 F.3d at 735.

For the foregoing reasons, Section 2255 relief may not be granted to Petitioner on the basis that the Government allegedly failed to disclose an exculpatory statement that allegedly was relayed from Byrd to Byrd's attorney and then to the prosecutor.

v. <u>Claim 5</u>: <u>Danisha Byrd and Maisha Johnson</u>

Petitioner argues that counsel failed to investigate and call two witnesses:  (1) Danisha Byrd, who was Byrd's wife and "would have shown that Marfo was not part of the meetings [discussing the murder of Callaway] at Byrd's apartment," and (2) Maisha Johnson, who was Marfo's live-in girlfriend and would have contradicted Davis's testimony that Marfo had met with Davis in Marfo's home on the night of Callaway's murder.  Am. Mot. 38-39, ECF No. 277.  According to the Petitioner, these two

19

witnesses would have impeached Davis's testimony about Marfo's involvement in the murder conspiracy.

The Government argues that strategic choices as to which witnesses to call are virtually unchallengeable. As to Danisha Byrd, the Government contends that trial counsel reasonably decided to not call her because she had testified before the grand jury that she had no knowledge of the murder. As to Maisha Johnson, the Government contends that not calling her was a reasonable strategy because her testimony may have been harmful to Marfo and could open his case up to collateral damage regarding other criminal activity. Gov.'s Resp. at 100-118, ECF No. 231.

As previously stated, the Court must give a high degree of deference to defense counsel's decisions on which witnesses to call. Powell, 850 F.3d at 149; Dyess, 730 F.3d at 364; Greene, 155 F.3d at 404.

Attorney Purpura stated in his affidavit that he considered calling Maisha Johnson but that "[t]he best Ms. Johnson offered was that she did not remember Davis ever coming to [the] apartment in the early morning hours, and if he did she was a light sleeper and it would have disturbed [her] sleep." Purpura Aff. At 2, ECF No. 231-3. He made a determination that the value of this testimony was "minimal" and made the "tactical decision not to call her." Id. He recounted his concerns about

opening up the case to challenges on cross-examination, including Johnson's close relationship with Marfo, her purported lack of knowledge of Marfo's prior criminal activity and source of income, her knowledge of Marfo's and Davis's significant relationship (including knowing which of two black leather recliners was used by Davis when playing video games in Marfo's home), and his own determination that she did not have the demeanor to make a good witness.  Id. at 2-3.

As to Danisha Byrd, Purpura stated that he decided not to call her as a witness because she "denied any knowledge of the Callaway murder or any other murder" before the grand jury and was limited to that testimony.  Id. at 3.  Moreover, Purpura understood that she had "limited contact with Marfo" and made the determination that her testimony about him would have little or no value.  Id.

Under the required deference owed to counsel's trial strategy, the Court cannot make the finding that Petitioner established deficient performance or prejudice from counsel's decision not to call these two witnesses.  Purpura's stated reasons for not calling these two witnesses were reasonable and certainly not "'so serious[ly in error] that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  Powell, 850 F.3d at 149.  Moreover, it is far from clear that not calling these witnesses would have been

prejudicial to Marfo.  In fact, the record shows that these two witnesses had testimonial weaknesses that could have proved harmful to Marfo's case.

For the foregoing reasons, Section 2255 relief may not be granted to Petitioner on the basis that counsel did not call Maisha Johnson and Danisha Byrd at trial.


### vi. Claim 6: Cell Phone Tower Evidence

At trial, the Government used T-Mobile records from Davis's cell phone to corroborate his testimony about events on April 11, 2011, the night of the murder.  Specifically, the Government presented cell-tower records showing that Davis was at a strip club at the time of the murder as part of his planned alibi, drove to Crystal Street to meet Byrd at the scene of the crime after the murder, drove to Marfo's apartment on Romaric Court in Baltimore County, and finally left to pick up his son for school.  Gov.'s Resp. at 119, ECF No. 231.  Notably, the Government's witness, Detective Gruss, testified that the cell-tower records placed Davis at Marfo's apartment at 3:17 AM ("Call E"), just hours after Callaway is murdered.  Am. Mot. at 58, ECF No. 277.

To defend against this testimony, Marfo's counsel relied on a cell-tower expert, Folsom, who would support the contention that Davis lied about meeting Marfo after Callaway's murder.

Am. Mot. at 20, ECF No. 277.  Folsom testified that it was
impossible to know from which direction the 3:17 A.M. "Call E"
data transmission came from because the tower that recorded the
data was "omni-directional," so the data could have easily have
come from Davis's grandmother's house nearby (which is listed as
Davis's home address on his driver's license).  Gov.'s Resp. at
124-125, ECF No. 231.

Folson's testimony regarding the omni-directional tower was
found to be inaccurate at a post-trial and post-verdict hearing
on October 16, 2012 [ECF No. 110].  In fact, the tower was a
"standard multi-antennae directional 'flag pole' cell tower,"
meaning that the 3:17 A.M. data transmission must have come from
Marfo's apartment, and could not have come from Davis's
grandmother's home.  Gov.'s Resp. at 125, ECF No. 231.

In his original Motion to Vacate, Petitioner advanced two
substantive arguments about counsel's use of cell-tower
evidence: specifically, that counsel should have insisted that
the Government call an expert to present the evidence, and that
counsel did not adequately prepare the defense expert witness as
to the accuracy of the data tower evidence.  Motion to Vacate at
8, ECF No. 211.  The Court will evaluate these two bases and
also address Petitioner's newly added argument that the cell-
tower records were reported in the wrong time zone.

## 1. Detective Gruss's Testimony

Petitioner argues that because cell-tower analysis may only be admitted through a qualified expert witness, trial counsel deficiently performed by not objecting to the admission of Detective Gruss's testimony, a non-expert. Am. Mot. at 44, ECF No. 277. Marfo contends that the evidence Detective Gruss gave about the cell-tower evidence was "technical" and "scientific," and thus inadmissible under Daubert.[3] Id.

The Government argues that Detective Gruss was merely using the phone records to plot the cell-tower information on a map using mapping software, and that the Fourth Circuit has approved the use of such non-expert testimony in a similar case. Gov.'s Resp. at 122, ECF No. 231 (citing United States v. Graham, 796 F.3d 332 (4th Cir. 2015), reh'g en banc granted, 624 F. App'x 75 (4th Cir. 2015), and adhered to in part on reh'g en banc, 824 F.3d 421 (4th Cir. 2016)).[4]

The Fourth Circuit in Graham found that Agent Simons's testimony "regarding his creation of maps" that "plot the locations of certain cell sites listed in the CSLI records" and "identify the dates and times of inbound and outbound calls made by Appellants' phones through the plotted cell sites . . . did

---

[3] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).
[4] Graham was reheard en banc on different grounds, and the district court's judgment was affirmed in all respects. See United States v. Graham, 824 F.3d 421, 438 (4th Cir. 2016).

not amount to an expert opinion." Graham, 796 F.3d at 365.

Rather, Simons simply "utilized mapping software that was

marketed to the general public and required little more than

identification of the various locations he intended to plot."

Id. The "minimal technical knowledge or skill" required to

complete this task did not constitute a "matter of expertise"

within the meaning of Fed. R. Evid. 702. Id. at 366. Moreover,

the Fourth Circuit held that another non-expert's testimony

(Strohm) regarding the existence of certain factors that would

affect how a cell phone connected with a cell site was

admissible and "did not rise to the level of an expert opinion."

Id. at 365-366.

Detective Gruss's methodology for analyzing the call

records and mapping the various data transmissions of Davis's

cell phone was described in detail at trial. He testified that

once he receives cell phone records from the companies, he would

narrow down which calls he wanted to analyze by "utiliz[ing] a

program known as Pen-Link" which "allows [him to] run specific

checks of phone numbers." Trial Day 6 Tr. at 144:23-145:2, ECF

No. 144. This is simply "conducting searches utilizing the

system." Id. at 145:20-23.

Then, to analyze the location of calls, Detective Gruss

testified that the cell phone company records would tell him

which tower "was utilized to make or complete that

communication," through a Location Area Code ("LAC") or a Cell ID ("CID"). Id. at 149:12-150:5. More information about any particular cell-tower, including location (address, longitude & latitude), can be obtained online using the unique LAC or CID number of the cell-tower. Id. at 154:19-23.

Finally, Detective Gruss explained how those calls are "mapped" using the cell-tower location data. He enters the location data into a common program, "Microsoft Streets & Trips, and it will pinpoint each one of the latitudes and longitudes as a dot point." Id. at 176:19-23. Once each of the relevant points was plotted out onto a map, Detective Gruss was able to provide his opinion about Davis's movements during the night of the murder, including the general location and time of each call.[5]

This testimony falls within the Graham court's ruling regarding admissible lay opinion testimony about cell-tower evidence. In Graham, the Fourth Circuit acknowledged the existence of lay testimony that could prove problematic (e.g., "explanations of how cell phones connect to a cellular network . . . [including] technical details about operations performed by cell sites and how calls are routed through network switches").

---

[5] Cell phone companies also provide information showing "which side of a tower is being utilized by the phone that made that particular activation," which allowed Detective Gruss to tell which direction relative to the tower the call was coming from. Id. at 186:19-187:9.

Graham, 796 F.3d at 365.  However, the critical testimony here—Detective Gruss's testimony about Davis's location and movements through the night—was properly admitted because it did not rise to that level of technicality.  Rather, Detective Gruss's testimony relied on his use of mapping software that has been deemed proper non-expert testimony in Graham.

The Court acknowledges that at the time of trial in 2012, it stated that Detective Gruss was an expert:

> MR. BUSSARD: Well, I don't think [Detective Gruss] is here as an expert, but he is here as a testimonial witness.
> THE COURT: I think he is here as an expert.

Trial Day 6 Tr. at 223:8-10, ECF No. 144.  Regardless, it is now clear under Fourth Circuit precedent that the type of evidence Detective Gruss provided could be properly admitted without qualifying him as an expert.

For the foregoing reasons, Section 2255 relief may not be granted to Petitioner on the basis that counsel did not require the Government to qualify Detective Gruss as an expert witness.

## 2. Poor Preparation of Defense's Expert Witness

Petitioner also argues that the expert's opinions were "formed with inaccurate and unreliable information about the cell tower itself and T-Mobile's cell site historical records." Am. Mot. at 20, ECF No. 277.

Petitioner initially rested his argument on the fact that the expert mistakenly believed that the cell-tower was omnidirectional (i.e., accepting signals from all directions) when it was directional (i.e., accepting signals from the area that only included Marfo's apartment). Id. at 46. Thus, he argues, the expert gave inaccurate testimony regarding where the 3:17 AM call originated from. In response, the Government argues that this claim should be denied because even if the expert gave inaccurate testimony, the inaccurate testimony helped the Petitioner at trial. In fact, Petitioner's expert testified to the jury that because the cell-tower was omnidirectional, the received signals could have come from the direction of Davis's grandmother's house, when it was later discovered that the expert was mistaken and the signal could only have come from the direction of Marfo's apartment. Gov.'s Resp. at 124-126, ECF No 231.

The Court finds that the erroneous testimony regarding the omnidirectional tower did not result in any prejudice to Petitioner, defined as a "reasonable probability . . . sufficient to undermine confidence in the outcome.'" Rodriguez, 842 F.3d at 346. In fact, the testimony was helpful to him by creating some doubt as to whether the 3:17 A.M. call came from Marfo's apartment or from Davis's grandmother's home. Without

prejudice, Petitioner has not carried his burden of showing entitlement to relief on this basis under Section 2255.

### 3. Time Zone Disparities

The Amended Petition includes a claim that the cell-phone tower evidence presented at trial was inaccurate because data transmissions that connect with T-Mobile cell-towers are recorded in Pacific Time Zone. Am. Mot. at 21, ECF No. 277. Based on this theory, the 3:17 A.M. call actually occurred at 6:17 A.M. in Eastern Standard Time. Id. Had counsel investigated this fact and prepared its expert more thoroughly, Petitioner argues, the defense could have thoroughly discredited both Davis's and Detective Gruss's testimony by showing that each cell-tower activation occurred three hours later than stated by prosecution witnesses. Id. at 63. In response, the Government argues that the claim should be denied because (1) it was based on an incorrect statement by a T-Mobile representative which has since been rescinded, and (2) it is time-barred because was presented for the first time in Marfo's Amended Motion and does not relate back to any prior claim in the original Motion to Vacate. Gov.'s Consolidated Resp. at 22, ECF No. 287.

Even assuming that the newly added claim can now be considered, the record supports the Government's position that

Petitioner's time zone claim is based on an incorrect assumption about Davis's cell phone payment plan. Petitioner attaches an email from Sue Johnson Kania, a Manager of Law Enforcement Relations at T-Mobile, who stated that times listed in the records "are in pacific time." Am. Mot. Ex. 1, ECF No. 277-2. This statement has since been rescinded by the very same T-Mobile representative based on further investigation. <u>See</u> Letter to Court Attach. A, ECF No. 282-1 (Kania explaining that Davis's cell phone is on a "flex-pay" account, meaning that its data transmissions are all in "<u>local market time</u>" and "not in Pacific as what I had stated to Steven Earlier [sic]") (emphasis in original). This was also verified by Joseph M. Sierra, a T-Mobile representative who works in External Law Enforcement Relations. <u>See</u> Letter to Court Attach. B, ECF No. 282-2 ("I have reviewed the records and I can say definitively that the voice, SMS, and Data are local time (where the tower is located). Typically data and sms are pacific, but in the situation when the account is a flex-pay or family mobile plan it is local time"). Therefore, the testimony at trial was not reported in the wrong time zone.

Accordingly, there is no basis in the record for the Court to find that counsel's representation with regard to expert witness Folsom was deficient.

vii. <u>Claim 7</u>: <u>Rosemond Instruction</u>

Petitioner argues that trial counsel provided ineffective assistance when failing to request an advanced-knowledge instruction for Count 5, a Section 924(c) violation,[6] under <u>Rosemond v. United States</u>, 134 S. Ct. 1240 (2014).[7] Am. Mot. at 65, ECF No. 277.

Specifically, Petitioner argues that counsel should have requested an instruction that Marfo had prior knowledge that Byrd planned to use a firearm during the Callaway murder. Although <u>Rosemond</u> was decided on March 5, 2014 (nearly two years after the jury trial was held in this case), Petitioner argues that trial counsel "had to know and understand that the <u>Rosemond</u> litigation was moving through the appellate courts." Am. Mot. at 65, ECF No. 277. Petitioner also argues that appellate counsel should have raised the <u>Rosemond</u> issue on direct appeal because the Supreme Court had already granted certiorari in that case. Am. Mot. at 67, ECF No. 277.

The Government argues that counsel could not have "failed" to request a <u>Rosemond</u> instruction when Rosemond was not decided until almost two years after the trial, and that to decide

[6] Section 924(c) prohibits the possession of a firearm in furtherance of a crime of violence. 18 U.S.C.A. § 924.
[7] In <u>Rosemond</u>, the Supreme Court found that the District Court erred in instructing the jury by not explaining that Rosemond needed to have advance knowledge of a firearm's presence to be guilty of aiding and abetting under Section 924(c). <u>Rosemond v. United States</u>, 134 S. Ct. 1240, 1251 (2014).

otherwise would be requiring counsel to predict the future.
Moreover, the Government argues that the jury was instructed on
two alternative theories of liability for the Section 924(c)
violation:  the "aiding and abetting" theory and the Pinkerton
co-conspirator liability theory.[8]  Gov.'s Resp. at 128, ECF No.
231.  Therefore, the Government argues that even if Rosemond had
been applicable, the conviction could have been independently
based on Pinkerton liability.  Id.

The jury trial in this case was held in late July and early
August of 2012.  The 10th Circuit decision in Rosemond was not
released until September 18, 2012, over a month after the jury
trial in this case was held.  And the Supreme Court decision in
Rosemond was not decided until March 14, 2014, nearly two years
after the jury trial.

The undersigned has addressed the retroactivity of Rosemond
in United States v. Franklin, No. CR MJG-11-0095, 2017 WL 68638,
at *4 (D. Md. Jan. 6, 2017).  Franklin was a case which was on
direct appeal when certiorari was granted in Rosemond.  Franklin
argued on a Section 2255 motion that he should have been
afforded an opportunity to have a Rosemond instruction, even
though Rosemond was decided after the Fourth Circuit affirmed
his conviction.  The Court applied Rosemond retroactively based
on Department of Justice guidance, found that it was "plain

---

[8] Pinkerton v. United States, 328 U.S. 640 (1946).

error" to not give an advanced-knowledge instruction, and found that the error was prejudicial because the evidence had been inadequate to establish Petitioner's guilt on a <u>Pinkerton</u> theory of liability.  The decision has since been appealed.

Here, Marfo could properly be found guilty on a <u>Pinkerton</u> liability theory rather than as an aider and abettor.  The ultimate question under <u>Pinkerton</u> is whether it would be reasonably foreseeable for Byrd to have carried a firearm when killing Callaway.  "The <u>Pinkerton</u> doctrine makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy."  <u>United States v. Hare</u>, 820 F.3d 93, 105-106 (4th Cir. 2016).  An act is reasonably foreseeable when it is the "necessary or natural consequence of the unlawful agreement."  <u>Pinkerton</u>, 328 U.S. at 648.  If the jury was properly instructed on <u>Pinkerton</u> liability and "the evidence amply demonstrates that it was reasonably foreseeable" to Marfo that Byrd would possess a firearm, then the <u>Rosemond</u> issue need not be decided.  <u>Hare</u>, 820 F.3d at 105.  See also <u>United States v. McManus</u>, 23 F.3d 878, 883 (4th Cir. 1994) (stating that a "defendant could be convicted of a § 924(c) charge predicated on conspiracy when the use of a gun by a coconspirator was reasonably foreseeable to the defendant").

The jury was instructed about the potential that Marfo
could be found to be a co-conspirator for Count 5.  Trial Day 7
Tr. at 139:8-13, ECF No. 145 ("So as to each of the substantive
counts in the murder category, Counts 2, 4 and 5, there is no
evidence that Mr. Marfo physically committed the charged crime.
Nevertheless, it is possible for the government to establish
that he is guilty as a co-conspirator.").  Using a gun to murder
the witness could be deemed "reasonably foreseeable," in
contrast to other methods of murder (e.g., using a knife or
blunt force).  Moreover, based on Fourth Circuit precedent, the
use of a gun in less direct crimes of violence than murder has
been found to meet the "reasonably foreseeable" standard.  See,
e.g., United States v. Cummings, 937 F.2d 941, 945 (4th Cir.
1991) (adopting the reasoning of a Seventh Circuit case which
found that defendant could be convicted of a § 924(c) charge
predicated on conspiracy when the use of a gun by a
coconspirator was reasonably foreseeable to the defendant
because drug dealing is "a dangerous, violent business" and it
was "quite reasonable to assume that a weapon of some kind would
be carried"); United States v. Harrison, 272 F.3d 220, 223 (4th
Cir. 2001) (finding that even though Harris did not carry a gun
during a robbery, the district court did not clearly err in
finding that "Harrison could reasonably foresee that one of his

armed co-defendants might fire a weapon so as to create a risk of serious bodily injury.").

The facts of this case also favor the finding that using a gun to murder Callaway was reasonably foreseeable.  The evidence shows that Davis, Byrd, and Marfo were familiar with using guns in their various criminal activities and would expect the murder of Callaway to be carried out using a gun.

The Court notes here a few examples of relevant testimony from trial that demonstrate that Marfo reasonably believed that Byrd would kill Callaway using a firearm.  Davis owned a gun but stated that he did not want to use it for the murder "[b]ecause the ballistics would come back to [him]."  Trial Day 2 Tr. at 252:6-12, ECF No. 136.  Rather, Davis testified that the gun that was used to murder Callaway was supplied "fresh out of a box" to Byrd by someone named "Hood."  Trial Day 3 Tr. at 90:18-24, 91:5-11, ECF No. 137.  Moreover, Davis and Marfo had hoped Callaway would have a gun on him when he was found dead, so that it would look like a drug deal gone bad.  Trial Day 2 Tr. 257:24-258:3, ECF No. 136 ("If he had a gun on him, he had drugs on him, then I thought that the Baltimore City Police would just look at it like it's just another drug deal gone bad or, you know, he's just a violent criminal, he got shot in the process of whatever he was doing.").  Davis confirmed Marfo was part of those discussions.  Id.  Moreover, Davis and Marfo also "picked

where [they] were going to get rid of the gun the day after the murder." Trial Day 3 Tr. 50:14-20, ECF No. 137.

Because the evidence could demonstrate that it was reasonably foreseeable to Marfo that Byrd would possess a firearm when murdering Callaway, Marfo could be convicted under the Pinkerton doctrine, and any error in the aiding and abetting instruction would not justify relief under Section 2255.

### viii. Claim 8: Bad Acts Evidence

Petitioner contends that counsel performed deficiently when they failed to prevent the Government from introducing the following "bad acts" into evidence pursuant to Fed. R. Evid. 404(b): "(1) Marfo's use of marijuana, (2) Marfo['s] destruction of evidence of marijuana possession, (3) Marfo's threat to kill a witness in a previous case, (4) Marfo's prior heroin dealing, (5) Marfo's threat to kill another witness in this case, Copeland, (6) Marfo's participation in a theft scheme at a local mall, and (7) Marfo's assault of a co-conspirator, Pearson." Am. Mot. at 72, ECF No. 277. The Government argues that each of these challenges has been raised on appeal and rejected by the Fourth Circuit, which found that the evidence was intrinsic to the case. Gov.'s Resp. at 130, ECF No. 231.

The Government is correct that the Fourth Circuit has already made rulings on each of these pieces of evidence:

- Marfo's use of marijuana and his destruction of evidence of marijuana possession was deemed to be "intrinsic to the commission of an act in furtherance of the ongoing bank fraud scheme," relevant to "establishing the continuing relationship between Marfo and Davis after Callaway's murder," intrinsic to Marfo's recruiting methods for his fraud schemes, "relevant to Pearson's identification of Marfo as the one who recruited him in relation to the bank fraud scheme," and would have been evidence of motive and participation under Rule 404(b). Marfo, 572 F. App'x at 224.

- Marfo's prior heroin dealing was deemed to be "probative of the very formation of the conspiracy between Davis and Marfo," and was "relevant and necessary in establishing the context of the relationship between Davis and Marfo." Id. at 225.

- Marfo's threats to kill a female witness in a previous theft case and his threats to "pop" Copeland were "intrinsic to the 'story' at trial," were "probative of the existence of the ongoing fraud conspiracy and of Marfo's motive and intent to murder Callaway to preserve that ongoing fraud scheme," were "intrinsic evidence of consciousness of guilt," and could also have been admitted under Rule 404(b). Id. at 226.

- Marfo's assault of co-conspirator Pearson was deemed "intrinsic to the charged crimes," was "an act in furtherance of the ongoing bank fraud conspiracy," and was "intertwined with the conspiracy to murder Callaway." Id. at 227.

- Marfo's participation in a theft scheme at a local mall was deemed to not constitute a bad act. Id. The Fourth Circuit stated that even if it did constitute a bad act, the evidence was "intrinsic to how Marfo and Styron met and how Marfo recruited Styron into the stolen money order scheme." It was also properly admitted under 404(b). Id.

Accordingly, Petitioner's Section 2255 claim based on counsel's alleged errors relating to the admission of prior "bad acts" evidence must be rejected.

### ix. Claim 9: Cumulative Error

Finally, Petitioner argues that the "cumulative impact" of these errors "constitutes ineffective assistance of counsel and a fundamentally unfair trial," citing Harris By & Through Ramseyer v. Wood, 64 F.3d 1432, 1439 (9th Cir. 1995) (finding that trial counsel's performance was deficient in eleven ways and that they cumulatively prejudiced the defendant). Am. Mot. at 80-81, ECF No. 277. The Government counters that the Fourth Circuit requires an individual examination of each claim, rather than considering the cumulative impact of alleged errors.

The Government appears to be correct that the Fourth Circuit does not follow the cumulative error doctrine. Indeed, the Fourth Circuit has explained that although there is a circuit split on this question, "it has long been the practice of this Court individually to assess claims under Strickland v. Washington." Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998). Each ineffective assistance of counsel claim "must be reviewed individually, rather than collectively." Id.

Even if the cumulative error doctrine were applicable in this Circuit, Petitioner would still not prevail because he has

not shown error by his trial counsel sufficient to vacate his judgment, let alone cumulative error.

Accordingly, Petitioner's Section 2255 claim based on cumulative error of counsel must be rejected.


III.   PETITION FOR DISCOVERY

A. Legal Standard

Discovery in connection with a habeas petition may be granted only if the judge finds good cause for discovery. United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) ("'a prisoner may engage in discovery only "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants him leave to do so, but not otherwise.'") (internal citations omitted).

"'Good cause'" exists if there is "'reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" Higgs v. United States, 711 F. Supp. 2d 479, 502 (D. Md. 2010) (citing Bracy v. Gramley, 520 U.S. 899, 908-09 (1997)).


B. Discussion

Petitioner's request for leave to conduct discovery was based on his time zone claim. See Pet. Mot. Disc. at 14, ECF No. 278 ("T-Mobile data transmissions, as distinguished from

39

ordinary cell phones, <u>are recorded in Pacific Time</u>.").  He
requested that the Court "authorize Mr. Marfo to discover what
the Prosecution Team knew about the accuracy of <u>data</u>
<u>transmissions</u> . . . and what the Defense Team did, if anything,
to investigate the accuracy of <u>data transmission</u> in preparation
for trial and later in preparation for the post-trial hearing on
the cell tower fiasco."  <u>Id.</u> at 17 (emphasis in original).

As previously discussed, the basis for his claim has been
rescinded by two T-Mobile representatives, who have clarified
that because Davis's cell phone was on a "flex-pay" account, its
data transmissions are made in local time (<u>i.e.</u>, Eastern
Standard Time), and not Pacific Time.  These statements
regarding flex-pay accounts are not disputed.  More discovery
would not demonstrate that he is entitled to relief on this
basis.  <u>Higgs</u>, 711 F. Supp. 2d at 502.  Under the circumstances,
the Court finds that the Petitioner has not stated a good cause
for discovery into what both trial teams knew about data
transmissions.

Accordingly, Petitioner's Motion for Leave to Conduct
Discovery [ECF No. 278] is DENIED.

IV.   <u>CONCLUSION</u>

For the foregoing reasons:

  1. Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate,
     Set Aside, or Correct Sentence by a Person in Federal
     Custody [ECF No. 211] is DENIED.

  2. Petitioner's Amended Motion to Vacate, Set Aside, or
     Correct Judgments [ECF No. 277] is DENIED.

  3. Petitioner's Motion for Leave to Conduct Discovery
     [ECF No. 278] is DENIED.


     SO ORDERED, this <u>Friday, January 19, 2018</u>.


                      _____/s/_____
                         Marvin J. Garbis
                    United States District Judge